Filed 2/7/22

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| DEPARTMENT OF CORRECTIONS AND REHABILITATION,<br><br>      Plaintiff and Appellant,<br><br>      v.<br><br>STATE PERSONNEL BOARD et al.,<br><br>      Defendants;<br><br>VICKIE MABRY-HEIGHT,<br><br>      Real Party in Interest and Respondent. | C084698<br><br>(Super. Ct. No. 34-2014-80001862) |

APPEAL from a judgment of the Superior Court of Sacramento County, Shelleyanne W.L. Chang, Judge. Affirmed.

Xavier Becerra and Rob Bonta, Attorneys General, Chris A. Knudsen, Senior Assistant Attorney General, Elisabeth Frater, Gary S. Balekjian and Kevin K. Hosn, Deputy Attorneys General, for Plaintiff and Appellant.

Wilton Law and Mediation, Ronald D. Wilton; Ivie McNeill Wyatt Purcell & Diggs and Rodney S. Diggs for Real Party in Interest and Respondent.

1

In this employment case, the State Personnel Board (Board) sustained a complaint brought by Vickie Mabry-Height, M.D., against the Department of Corrections and Rehabilitation (Department) alleging discrimination based on age, race, and gender in violation of the California Fair Employment and Housing Act (Gov. Code, § 12900 et seq.)[1] (FEHA). The Board concluded that Dr. Mabry-Height established a prima facie case of unlawful discrimination based on certain conduct described below and the Department failed to rebut the presumption of discrimination by offering evidence that it had a legitimate, nondiscriminatory reason for this conduct. The Department petitioned the trial court for a writ of administrative mandamus seeking an order setting aside the Board's decision. This petition was denied, and judgment was entered in favor of Dr. Mabry-Height. The Department appeals. We affirm.

## BACKGROUND

In accordance with the standard of review, we recite the factual background in the light most favorable to the Board's findings. (*Hosford v. State Personnel Bd.* (1977) 74 Cal.App.3d 302, 306-307.) We also confine our factual recitation to those facts relevant to Dr. Mabry-Height's specific allegations of discrimination, which she divided into three categories: (1) May 2008, when she was told there were no vacant physician/surgeon positions in the Department's southern region; (2) July through September 2008, when she was denied the opportunity to interview for vacant positions; and (3) October 2008, when her credentialing to work for the Department as a registry physician/surgeon was revoked.

### First Category of Alleged Discrimination

Dr. Mabry-Height is an African-American female who was 52 years old in May 2008. On the 19th of that month, she arrived at a location in Rancho Cucamonga to

---

[1]     Undesignated statutory references are to the Government Code.

interview for what she believed to be an open physician/surgeon position at Chuckawalla Valley State Prison (CVSP) in Blythe. Dr. Mabry-Height had applied for that position three months earlier. She also took an examination designed to assess her qualifications for the position. After the Department's credentialing unit confirmed she met the minimum qualifications for the position (i.e., that she possessed a valid medical license and board certification) and determined she received a score of 95 percent on the exam, Dr. Mabry-Height was notified that she would be placed on the eligibility list for physician/surgeon positions. However, after speaking with Dr. Steven Ritter, the Department's medical director for the southern region, and hiring authority for physician/surgeon positions within that region, she withdrew her application for the position. About two months later, having reconsidered this decision, Dr. Mabry-Height informed the Department that she again wanted to be considered for an interview. The CVSP position was filled three days later, almost a month before Dr. Mabry-Height's scheduled interview date.

On May 19, 2008, Dr. Mabry-Height and several other applicants were separately interviewed by Dr. Bruce Barnett, the Department's medical director for the central region, and another doctor, Dr. T. Le. Although Dr. Mabry-Height and the other applicants had applied for a position in the southern region, the position in that region had been filled about a day before the interviews. Rather than cancel the interviews, Dr. Barnett decided to proceed with the interviews in an attempt to fill vacant positions in the central region. After informing Dr. Mabry-Height of the situation, Dr. Barnett persuaded her to continue with the interview although she was reluctant to do so and appeared surprised and disappointed that the position for which she was there to interview had already been filled.

The interview consisted of four questions and each applicant's answers were scored. Dr. Mabry-Height's overall score was 6.8, a slightly below average score. However, Dr. Barnett also reviewed her curriculum vitae and considered her educational

3

background extraordinary and elite, although he also believed she lacked recent clinical experience.[2]  Nevertheless, Dr. Barnett would have offered Dr. Mabry-Height a position in the central region had she been willing to relocate.  She was not.

### Second and Third Categories

In June 2008, Dr. Mabry-Height began working for Physician Specialist Registry, a third party provider that contracts with the Department to provide needed medical personnel to correctional institutions.  After the Department's credentialing unit approved her to work registry shifts, Dr. Mabry-Height worked various shifts at Centinela State Prison (CSP) between June and October 2008, seeing approximately 575 patients during that time period.

On June 23, 2008, Dr. Mabry-Height submitted a second application for employment with the Department, again seeking a physician/surgeon position in the southern region, specifying that she would be willing to work for CVSP, CSP, or California Rehabilitation Center (CRC).  She again took the required examination and was informed that she passed with a score of 85 percent and would be placed on the eligibility list for physician/surgeon positions.

The following month, Dr. Mabry-Height contacted Dr. Ritter and asked whether there were any open positions at CVSP.  Dr. Ritter said there was an open position and that the Department was beginning to schedule interviews.  Dr. Mabry-Height told Dr. Ritter that she was interested in the position.  However, no one at the Department contacted her to schedule an interview.

---

[2]  Because Dr. Mabry-Height's qualifications are not in question, we decline to recount her educational and employment background in any detail.  We do note that at the time of her interview, she was employed by the State Department of Social Services (DSS) as a full-time medical consultant and also worked for the Medical Board of California.

4

On July 18, 2008, four days after Dr. Mabry-Height contacted Dr. Ritter to inquire about open positions at CVSP, the Department hired Dr. James Veltmeyer, a Hispanic male between 21 and 39 years of age, to fill a physician/surgeon position at that facility. According to the Department's documentation, Dr. Veltmeyer interviewed for the position in March 2008 and did not submit his employment application until more than two weeks after the interview. That application indicated that Dr. Veltmeyer was only interested in a position in the San Diego area. Dr. Veltmeyer did not complete his residency training until June 30 and did not become board-eligible until July 2008. The Department's board of governors discourages hiring a physician who lacks board certification. Dr. Ritter also testified that he did not consider residency training to be the same as work experience when reviewing an applicant's qualifications for an open position.

Interviews were held for another open physician/surgeon position at CVSP on July 29, 2008. As mentioned, Dr. Mabry-Height was not invited to participate. Dr. Patricia James, a Caucasian female between 40 and 69 years of age, was hired to fill the position. Dr. James submitted her application in May 2008. Her qualifications were comparable to those of Dr. Mabry-Height.

In August 2008, Dr. Mabry-Height told Dr. Nasaria Barreras, the health care manager and hiring authority for CSP, that she was interested in a position at that facility. During one of her registry shifts at CSP, Dr. Mabry-Height went to the cafeteria to work on an application for medical staff membership and privileges in the correctional treatment center at CSP. While she was there, Dr. Barreras needed assistance with a patient and could not locate Dr. Mabry-Height for over an hour. Dr. Barreras later informed her the cafeteria was considered " 'off grounds' " because it was not within the medical provider area. Dr. Mabry-Height deducted from her timesheet the hour she spent at the cafeteria working on her application.

5

About two weeks later, the credentialing unit contacted Dr. Barreras regarding Dr. Mabry-Height's suitability for future employment with the Department. Dr. Barreras responded by noting that she had not been the subject of any disciplinary actions. Sometime later, Dr. Robert Chapnick, the Department's chief medical officer, contacted Dr. Barreras seeking further information regarding Dr. Mabry-Height's performance. Dr. Barreras informed him about the cafeteria incident and also reported that her "levels of enthusiasm, confidence, and cooperative behavior were not always as consistently high as other registry physicians." One of those registry physicians, Dr. Ko, an Asian male, was hired for a physician/surgeon position at CSP around the same time period. Once again, Dr. Mabry-Height was not invited to interview for this position.

In September 2008, Dr. Mabry-Height contacted Dr. Ritter and asked about the status of interviews for the CVSP position they had previously discussed. He informed her there were no current vacancies because two candidates who had been making their way through the application process (i.e., Drs. Veltmeyer & James) had recently accepted positions.

In October 2008, Dr. Chapnick informed Dr. Barreras that the credentialing unit would be revoking Dr. Mabry-Height's credentials as a registry physician, but that she remained free to apply for open positions with the Department. Thereafter, Dr. Mabry-Height was told not to report to work for any future registry shifts.

The credentialing unit later advised Dr. Mabry-Height that " 'authorization to hire [her] as a Physician and Surgeon is denied due to not meeting the [Department's] requirements.' " Dr. Mabry-Height requested an explanation of the specific credential requirement she failed to meet and was told she could write an appeal letter to the credentialing committee. When she did so, she was informed that her appeal was denied "due to adverse recommendations from CSP, and that [she] did not consistently meet the needs of [the Department]."

6

*Administrative and Judicial Proceedings*

The foregoing facts were adduced during an evidentiary hearing held before Eileen T. Deimerly, administrative law judge (ALJ), in March 2011. Following submission of the case, ALJ Deimerly prepared a proposed decision sustaining the complaint. The following month, the Board remanded the matter to ALJ Deimerly and directed her to apply the analytical framework outlined in *Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317 (*Guz*). In September 2011, ALJ Deimerly submitted a revised proposed decision concluding Dr. Mabry-Height had failed to establish a prima facie case of unlawful discrimination. The Board approved this decision.

Dr. Mabry-Height challenged this decision in a petition for writ of administrative mandamus filed with the Los Angeles County Superior Court. That court granted the petition in December 2012 and directed the Board to set aside its decision and reconsider the matter. The court concluded " '[t]he ALJ's application of the undisputed facts to the [*Guz* analytical framework] was erroneous' " as a matter of law, explaining that Dr. Mabry-Height established a prima facie case of unlawful discrimination by producing evidence that she was not interviewed for positions for which she was well-qualified and less-qualified persons were hired for those positions, raising an inference that the Department discriminated against her on the basis of age, gender, and/or race.

In January 2013, the Board set aside its decision and again remanded the matter to ALJ Deimerly.[3] Accepting the superior court's determination that Dr. Mabry-Height established a prima facie case of unlawful discrimination, the ALJ addressed the second

---

[3]    In the meantime, in May 2011, Dr. Mabry-Height was dismissed from her position as a medical consultant with DSS. She appealed her dismissal to the Board, an evidentiary hearing was conducted, and in June 2012, the Board upheld the dismissal. This fact was relevant to the question of appropriate remedy, on which the ALJ ordered the parties to submit briefing, but is immaterial to the issues raised in this appeal. We mention it no further.

stage of the *Guz* analysis, i.e., whether or not the Department rebutted the presumption of discrimination by producing evidence of a legitimate, nondiscriminatory reason for the adverse employment action, and concluded it did with respect to the first category of alleged discrimination (May 2008 failure to hire), but not the second or third categories (July through September 2008 failure to interview/hire and October 2008 revocation of credentialing).

The Department's reason for not hiring Dr. Mabry-Height in May 2008 was there were no southern region positions available at the time of her May 19 interview, and while Dr. Barnett would have hired her for a central region position, she was not willing to relocate. The ALJ concluded Dr. Mabry-Height offered no evidence refuting Dr. Barnett's testimony in this regard and therefore failed to establish discrimination on the basis of age, race, or gender.

Turning to the Department's failure to interview Dr. Mabry-Height for open positions during the months that followed, the ALJ concluded the Department produced no evidence of a nondiscriminatory reason for this failure. With respect to the CVSP positions filled by Drs. Veltmeyer and James, the ALJ noted that Dr. Ritter, who was responsible for reviewing applications, determining which candidates to invite for interviews, and for conducting those interviews, "testified that he had no knowledge as to why [Dr. Mabry-Height] was not interviewed at that time." With respect to the CSP position filled by Dr. Ko, the ALJ explained: "Dr. Barreras testified that she considered [Dr. Mabry-Height] to be a competent and capable physician. Although Dr. Barreras testified about the incident when she had been unable to locate [Dr. Mabry-Height] for an hour, Dr. Barreras did not consider [her] ineligible for hire as a result of that incident. Neither Dr. Barreras nor Dr. Ritter offered any explanation at [the] hearing as to why [Dr. Mabry-Height] was neither interviewed nor offered that position. They did not testify that [she] lacked enthusiasm, confidence, or the ability to cooperate with others, or that any such concerns entered into their decisions not to interview or hire her." Based on the

8

Department's "fail[ure] to offer any evidence of a legitimate, nondiscriminatory reason for not interviewing or hiring [Dr. Mabry-Height] for the positions filled at CVSP in July and August 2008, or for the position filled at CSP in August 2008," the ALJ concluded the Department "failed to rebut the presumption of sex, age, and race discrimination regarding these positions" and Dr. Mabry-Height's "discrimination allegation, therefore, must be sustained."

Turning to the Department's revocation of Dr. Mabry-Height's credentialing, the ALJ noted that Dr. Ritter testified that the credentialing process is a standard, objective verification process. When Dr. Mabry-Height's credentials were initially approved, the credentialing unit simply verified that her medical license and board certification were valid. Dr. Mabry-Height provided unchallenged testimony that nothing changed in that regard between June and October 2008. And while the Department provided multiple nondiscriminatory reasons for revoking her credentialing status, the ALJ found these purported reasons to be "vague, ambiguous, and inconsistent with the stated objective purpose of credentialing." The ALJ explained: "After the revocation, [the Department] first told [Dr. Mabry-Height] that authorization was denied 'due to not meeting [Department] requirements.' Thereafter, when [she] appealed the revocation and asked what requirement she had failed to meet, [the Department] modified its reason for revocation and referred to an adverse recommendation from CSP, and claimed that [she] did not consistently meet the needs of [the Department]." The ALJ also explained that although Dr. Barreras told Dr. Chapnick about the cafeteria incident and also said her levels of enthusiasm, confidence, and cooperation were not as high as other registry physicians, "the evidence did not establish that these were the reasons [her] credentials were revoked, since Dr. Barreras testified that she considered [Dr. Mabry-Height] to be a capable physician." Dr. Barreras also told Physician Specialist Registry that Dr. Mabry-Height's credentialing was revoked because she was unable to work at least three days per week, not because of any failure to meet Department requirements. Perhaps most

9

importantly, Dr. Ritter testified that he was unaware of any Department requirement Dr. Mabry-Height failed to meet. The ALJ concluded: "[The Department's] vague and inconsistent reasons for revoking [Dr. Mabry-Height's] credentialing status in October 2008 fail to support a finding that its action was taken for a legitimate, nondiscriminatory reason."

In February 2014, the Board adopted the ALJ's proposed decision. The Department challenged this decision in a petition for writ of administrative mandamus filed with the Sacramento County Superior Court.

The Department argued the Board's decision should be set aside because Dr. Mabry-Height did not establish "an illegitimate criterion was a substantial motivating factor for any particular employment decision by [the Department]," relying on *Harris v. City of Santa Monica* (2013) 56 Cal.4th 203 (*Harris*), decided by our Supreme Court in February 2013, a month after the Board set aside its initial decision and remanded the matter to ALJ Deimerly. Without challenging the applicability of the *Guz* burden-shifting analytical framework, the Department argued "*Harris* increased the burden by requiring plaintiffs to prove that 'an illegitimate criterion,' i.e., discrimination, was a *substantial* motivating factor for the employment decision."

The Department also did not directly challenge that Dr. Mabry-Height "may have established a prima facie case" of discrimination, and instead relied on certain "additional facts" not contained within the factual findings adopted by the Board to argue the record contained substantial evidence that the Department possessed legitimate, nondiscriminatory reasons for the challenged conduct.[4]

---

[4] These "additional facts" are the following: (1) "[Dr. Mabry-Height] became eligible for, and expressed an interest in, a [physician/surgeon] position *only at* CVSP, CSP, or CRC and *only after* June 24, 2008"; (2) "On July 14, 2008, when [Dr. Mabry-Height] emailed Dr. Ritter to express an interest for the first time in a CVSP position, Dr.

10

With respect to the failure to interview/hire Dr. Mabry-Height for the two CVSP positions, the Department argued substantial evidence supported the existence of the following nondiscriminatory reason: "two candidates [(Drs. Veltmeyer & James)] who had made their way through the credentialing process had accepted the positions." The Department also acknowledged that Dr. Ko was hired for the CSP position, and that Dr. Mabry-Height was not interviewed for this position either, but argued "her failure to

Ritter replied to [her] *within an hour* to inform her that he believes there is an opening at CVSP and that he had copied CVSP's [Chief Medical Officer] Dr. Culton on the reply email"; (3) "On July 18, 2008, CVSP confirmed with Dr. Veltmeyer that he had accepted a [physician/surgeon] position at CVSP, a position for which he had interviewed in March 2008"; (4) "Dr. Veltmeyer completed internship and medical residency at [University of California,] San Francisco, a prestigious healthcare institution, and possesses verbal and written fluency in Spanish"; (5) "Medical residency training is considered by [the Department's] hiring doctors to be work experience, and even an unsupervised work experience"; (6) "Non-board certified doctors are qualified to practice for [the Department], and have been practicing for [the Department] for a long time"; (7) "On July 29, 2008[,] Dr. James interviewed for a [physician/surgeon] position at CVSP and accepted the position on August 25, 2008"; (8) "Dr. James worked full-time at CVSP as a [physician/surgeon] through a registry for a year prior to accepting the position, and was supervised by CVSP's [Chief Medical Officer] Dr. Culton"; (9) "Dr. James was an Assistant Professor in Emergency Medicine at Loma Linda University for *thirteen* years (not 'three' as incorrectly stated in the [Board's] Decision[)]"; (10) "During the May 19, 2008[,] interview, the interview panel did not score [Dr. Mabry-Height] as competitive as the other applicants"; (11) "During the May 19, 2008[,] interview, the interview panel did not believe that [Dr. Mabry-Height] had substantial clinical work experience, which is an important factor in order to work with the prison population"; (12) "[Dr. Mabry-Height's] credentialing was denied in October 2008 only as a *registry* physician at [CSP], and she remained 'free to apply as a Civil Servant and [would have been] evaluated using the same standards as the other Civil Service applicants' "; (13) "After October 2008, and prior to [Dr. Mabry-Height's] termination of employment in May 2011 by another state agency, [she] was eligible to apply for a Civil Servant position with any California state agency"; (14) "The reasoning set forth for the October 2008 denial of [Dr. Mabry-Height's] credentialing as a registry physician at [CSP] furthered [the Department's] legitimate business reasons, explained by [CSP's] Chief Medical Officer [Dr. Barreras], as follows on September 26, 2008: 'other registry physicians have been available, who more consistently meet the needs of the [CSP] medical department.' "

11

interview [for any of the positions] appears to be related to non-discriminatory factors," noting that Dr. Mabry-Height expressed interest in the CVSP position after Dr. Veltmeyer "had already interviewed and may have even accepted the job," Dr. James "had already worked full-time with the prison population at CVSP through a registry for a year preceding her acceptance of the position," and Dr. Ko "had also worked with the prison population at CSP through a registry" when he accepted the position there. The Department suggested "it could have been that [Dr. Mabry-Height] just wasn't [as] qualified as the other applicants to be invited to an interview," supporting this suggestion with her "below average" performance in her May 2008 interview.

Turning to the revocation of Dr. Mabry-Height's credentialing, the Department argued her credential was revoked "only as a *registry* physician" and the revocation did not affect her ability to apply for open physician/surgeon positions at the Department. The Department also argued that it supplied substantial evidence of a legitimate, nondiscriminatory reason for this revocation, specifically that it was "based on her performance at CSP," and "[a]ny discrepancies . . . do not demonstrate such 'weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions' in the [Department's] proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence.' [Citation.]"

In response, Dr. Mabry-Height argued the Department was precluded from challenging the Board's conclusion that she established a prima facie case of unlawful discrimination and "[t]he presumption of discrimination that follows establishment of a prima facie case is 'legally mandatory' in the absence of substantial rebuttal evidence" establishing the Department possessed legitimate, nondiscriminatory reasons for its conduct. Dr. Mabry-Height argued the *Harris* decision did not alter the first two stages of the *Guz* burden-shifting analysis. That decision, she argued, applies only in "a mixed motive case," where a prima facie case of discrimination is made, from which a discriminatory motive can be inferred, and the defendant offers substantial evidence of a

12

nondiscriminatory motive. In such a case, where the finder of fact could conclude the defendant "had both a discriminatory and a nondiscriminatory reason for its actions," *Harris* requires the plaintiff to prove, as part of the third stage of the analysis, that the discriminatory motive was a substantial motivating factor. But here, Dr. Mabry-Height argued, "either the [Department] had a discriminatory animus or it did not," so "*Harris* is not applicable."

With respect to the additional facts relied upon by the Department, Dr. Mabry-Height argued these purported facts were either inaccurate or failed to establish an abuse of discretion on the part of either the ALJ or the Board in concluding the Department did not provide substantial evidence of a nondiscriminatory reason for the challenged conduct. Dr. Mabry-Height highlighted: "Dr. Ritter admitted he had no knowledge as to why [she] was not interviewed in July 2008. In fact, he did not even recall [her] application. Dr. Ritter did not even know who made the decision not to hire [her]. [Dr. Chapnick], who wrote an email to [Dr. Barreras] confirming the Credentialing Unit revoked [Dr. Mabry-Height's] credentials as a Registry Physician effective October 8, 2008, did not testify. No one from the Credentialing Unit testified. [Dr. Barreras] testified and offered no explanation either why [Dr. Mabry-Height's] credentials were revoked other than to state it was the Credentialing Unit's decision. She did not speak to Drs. Ritter or Barnett." (Fns. omitted.) Based on the foregoing, Dr. Mabry-Height argued the Board did not abuse its discretion in concluding the Department did not produce substantial evidence that it possessed legitimate, nondiscriminatory reasons for failing to interview her or revoking her registry credential.

The trial court denied the petition. The trial court distinguished *Harris* as applying only where the employer "asserts another reason in support of its allegedly discriminatory action" and "the trier of fact finds that a mix of discriminatory and legitimate reasons motivated the employer's decision." Because the Board "found in many instances [the Department] offered no evidence in support of any legitimate reasons for its actions," the

13

trial court concluded *Harris* was inapposite. Turning to the additional facts set forth in the Department's briefing, the trial court concluded they did not establish the Board abused its discretion in concluding the Department failed to rebut Dr. Mabry-Height's prima facie case of discrimination. We decline to set forth the trial court's reasoning in greater detail because, as set forth immediately below, we are tasked with independently determining whether or not substantial evidence supports the Board's decision, not the trial court's conclusions regarding that decision.

This appeal followed.

DISCUSSION

I

***Standard of Review***

We begin with the standard of review. Where, as here, an administrative decision was "made as the result of a proceeding in which by law a hearing is required to be given, evidence is required to be taken, and discretion in the determination of facts is vested in the inferior tribunal, corporation, board, or officer" (Code Civ. Proc., § 1094.5, subd. (a)), trial court review of such a decision is limited "to the questions [of] whether the [administrative tribunal] has proceeded without, or in excess of, jurisdiction; whether there was a fair trial; and whether there was any prejudicial abuse of discretion. Abuse of discretion is established if the [administrative tribunal] has not proceeded in the manner required by law, the order or decision is not supported by the findings, or the findings are not supported by the evidence." (*Id.*, subd. (b).)

"Because the [Board] is vested with quasi-judicial powers, the trial court may not exercise its independent judgment, but must uphold the Board's findings if they are supported by substantial evidence. In applying the substantial evidence test, the trial court must examine all relevant evidence in the entire record, considering both the evidence that supports the Board's decision and the evidence against it, in order to determine whether that decision is supported by substantial evidence. [Citations.] This

14

does not mean, however, that a court is to reweigh the evidence; rather, all presumptions are indulged and conflicts resolved in favor of the Board's decision.  [Citation.]"  (*Telish v. State Personnel Bd.* (2015) 234 Cal.App.4th 1479, 1487.)

"These standards 'do not change on appellate review from a trial court's denial of a petition for writ of mandate from a decision of the [Board]; an appellate court independently determines whether substantial evidence supports *the* [*Board's*] *findings*, not the trial court's conclusions.'  [Citation.]  However, insofar as an appeal from an administrative mandamus proceeding presents questions of law, our review is de novo."  (*Telish v. State Personnel Bd., supra*, 234 Cal.App.4th at p. 1487.)

## II

### *Legal Framework Applicable to Workplace Discrimination Claims*

"California's FEHA provides in pertinent part:  'It is an unlawful employment practice, unless based upon a bona fide occupational qualification, or, except where based upon applicable security regulations established by the United States or the State of California:  [¶]  (a) For an employer, because of the race, . . . sex, . . . [or] age, . . . of any person, to refuse to hire or employ the person or to refuse to select the person for a training program leading to employment, or to bar or to discharge the person from employment or from a training program leading to employment, or to discriminate against the person in compensation or in terms, conditions, or privileges of employment.'  [Citation.]"  (*Harris, supra*, 56 Cal.4th at p. 214; § 12940, subd. (a).)

Our Supreme Court set forth the applicable legal framework for such workplace discrimination claims in *Guz, supra*, 24 Cal.4th 317:

"California has adopted the three-stage burden-shifting test established by the United States Supreme Court for trying claims of discrimination, including age discrimination, based on a theory of disparate treatment.  [(Citing several federal and California cases, including *McDonnell Douglas Corp. v. Green* (1973) 411 U.S. 792.)]

15

"This so-called *McDonnell Douglas* test reflects the principle that direct evidence of intentional discrimination is rare, and that such claims must usually be proved circumstantially. Thus, by successive steps of increasingly narrow focus, the test allows discrimination to be inferred from facts that create a reasonable likelihood of bias and are not satisfactorily explained.

"At trial, the *McDonnell Douglas* test places on the plaintiff the initial burden to establish a prima facie case of discrimination. This step is designed to eliminate at the outset the most patently meritless claims, as where the plaintiff is not a member of the protected class or was clearly unqualified, or where the job [she] sought was withdrawn and never filled. [Citations.] While the plaintiff's prima facie burden is 'not onerous' [citation], [she] must at least show ' "actions taken by the employer from which one can infer, if such actions remain unexplained, that it is more likely than not that such actions were 'based on a [prohibited] discriminatory criterion . . . .' [Citation]." [Citation.]' [Citation.]

"The specific elements of a prima facie case may vary depending on the particular facts. [Citations.] Generally, the plaintiff must provide evidence that (1) [she] was a member of a protected class, (2) [she] was qualified for the position [she] sought or was performing competently in the position he held, (3) [she] suffered an adverse employment action, such as termination, demotion, or denial of an available job, and (4) some other circumstance suggests discriminatory motive. [Citations.]

"If, at trial, the plaintiff establishes a prima facie case, a presumption of discrimination arises. [Citations.] This presumption, though 'rebuttable,' is 'legally mandatory.' [Citations.] Thus, in a trial, '[i]f the trier of fact believes the plaintiff's evidence, and if the employer is silent in the face of the presumption, the court must enter judgment for the plaintiff because no issue of fact remains in the case.' [Citations.]

"Accordingly, at this trial stage, the burden shifts to the employer to rebut the presumption by producing admissible evidence, sufficient to 'raise[] a genuine issue of

fact' and to 'justify a judgment for the [employer],' that its action was taken for a legitimate, nondiscriminatory reason. [Citations.]

"If the employer sustains this burden, the presumption of discrimination disappears. [Citations.] The plaintiff must then have the opportunity to attack the employer's proffered reasons as pretexts for discrimination, or to offer any other evidence of discriminatory motive. [Citations.] In an appropriate case, evidence of dishonest reasons, considered together with the elements of the prima facie case, may permit a finding of prohibited bias. [Citations.]" (*Guz, supra*, 24 Cal.4th at pp. 354-356, fns. omitted.)

However, "an inference of intentional discrimination cannot be drawn solely from evidence, if any, that the company lied about its reasons. The pertinent statutes do not prohibit lying, they prohibit discrimination. [Citation.] Proof that the employer's proffered reasons are unworthy of credence may 'considerably assist' a circumstantial case of discrimination, because it suggests the employer had cause to hide its true reasons. [Citation.] Still, there must be evidence supporting a rational inference that *intentional discrimination, on grounds prohibited by the statute, was the true cause* of the employer's actions." (*Guz, supra*, 24 Cal.4th at pp. 360-361; *McGrory v. Applied Signal Technology, Inc.* (2013) 212 Cal.App.4th 1510, 1531-1532 ["disbelief of an Employer's stated reason for a termination gives rise to a compelling inference that the Employer had a different, unstated motivation, but it does not, without more, reasonably give rise to an inference that the motivation was a prohibited one"].)

"The ultimate burden of persuasion on the issue of actual discrimination remains with the plaintiff" throughout the *McDonnell Douglas* analysis. (*Guz, supra*, 24 Cal.4th at p. 356.)

We finally note, as our Supreme Court has explained, this analytical framework "presupposes that the employer has a single reason for taking an adverse action against the employee and that the reason is either discriminatory or legitimate. By hinging

17

liability on whether the employer's proffered reason for taking the action is genuine or pretextual, the *McDonnell Douglas* inquiry aims to ferret out the 'true' reason for the employer's action." (*Harris*, *supra*, 56 Cal.4th at p. 215.) But where there is evidence from which the trier of fact could conclude the employer's action was caused by unlawful discrimination, and also evidence that it was caused by nondiscriminatory motivations, the plaintiff must prove "discrimination was a 'substantial factor' in the decision." (*Id*. at pp. 217, 225.)

### III

### *Analysis*

Narrowing the Department's contentions to the two that are dispositive of this appeal, the Department argues the Board abused its discretion by (A) not requiring Dr. Mabry-Height to demonstrate by a preponderance of the evidence that discrimination was a substantial motivating factor in the Department's challenged decisions, and (B) concluding the Department did not satisfy its stage-two burden of producing substantial evidence of legitimate, nondiscriminatory reasons for the challenged conduct. We address and reject each contention in turn.

### A.

### ***Where the Substantial Motivating Factor Standard Fits into the Analysis***

The Department relies on *Harris* in arguing Dr. Mabry-Height was required to "show by a preponderance of the evidence that discrimination was a 'substantial motivating factor' in the adverse employment decision[s]" made by the Department in this case. While we agree such a burden exists, and must be carried by the plaintiff, we conclude it applies to the third stage of the *McDonnell Douglas* analysis, i.e., only where a prima facie case of discrimination has been made by the plaintiff and the employer successfully rebuts the presumption of discrimination arising from the prima facie case by producing evidence of a legitimate, nondiscriminatory reason for the challenged conduct. Only then does the presumption of discrimination drop out of the case and the

18

plaintiff is held to her burden of persuading the fact finder that the proffered reason was merely a pretext for unlawful discrimination, or, even if the proffered reason is believed, prohibited discrimination was nevertheless a substantial motivating factor in the challenged adverse employment action.

An explication of *Harris* will make this clear. In that case, a bus driver (Harris), who was employed on a probationary basis with the city, was fired after two preventable accidents and two failures to report for her scheduled shift without giving her supervisor at least one hour's warning. (*Harris*, *supra*, 56 Cal.4th at pp. 211-213.) She was also pregnant, a fact she shared with her supervisor (Reynoso) about a week before she was fired. When she told Reynoso, he "reacted with seeming displeasure at her news" and asked for a doctor's note clearing her for continued work. (*Id*. at p. 212.) The same day Harris provided Reynoso with the requested doctor's note, which included some limited restrictions, Reynoso attended a supervisors' meeting and received a list of probationary drivers who "were not meeting standards for continued employment." (*Id*. at pp. 212-213.) Harris was on the list. She was fired two days later. (*Id*. at p. 213.)

Harris sued the city, alleging she was fired because she was pregnant, a form of sex discrimination; the city asserted it had a legitimate, nondiscriminatory reason for firing Harris, her poor performance during the probationary period. (*Harris*, *supra*, 56 Cal.4th at p. 213.) At trial, the trial court refused a jury instruction, proposed by the city, that would have instructed the jury that if it concluded the city " 'was actually motivated by both discriminatory and non-discriminatory reasons, the employer is not liable if it can establish by a preponderance of the evidence that its legitimate reason, standing alone, would have induced it to make the same decision.' " (*Ibid*.) Instead, the trial court simply instructed the jury "that Harris had to prove that her pregnancy was a 'motivating factor/reason for the discharge.' " (*Ibid*.) The jury concluded Harris's pregnancy was a motivating factor in the City's decision to fire her and awarded her both economic and noneconomic damages. (*Ibid*.) The Court of Appeal reversed and remanded for a new

19

trial, concluding the City's requested instruction was an accurate statement of the law and should have been given.  (*Id*. at p. 214.)

Our Supreme Court affirmed the Court of Appeal's judgment overturning the verdict, but for very different reasons.  The court rejected the City's assertion that "an employer's same-decision showing . . . is a complete defense to liability," as the City's requested instruction would have informed the jury.  (*Harris*, *supra*, 56 Cal.4th at p. 219; *id.* at p. 225.)  Thus, refusing the City's requested instruction was not the problem.  However, nor is it enough for a plaintiff to simply prove unlawful discrimination was "a motivating factor" in the adverse employment decision, as the jury was instructed.  The court explained:  "[T]here are at least three plausible meanings of the phrase 'because of' in section 12940[, subdivision ](a)—(1) discrimination was a 'but for' cause of the employment decision, (2) discrimination was a 'substantial factor' in the decision, and (3) discrimination was simply 'a motivating factor'—each of which is supported by some authority.  When faced with textual ambiguity, we often consult legislative history.  But our review of the FEHA's legislative history has uncovered nothing that bears on the kind or degree of causation required by section 12940[, subdivision ](a)."  (*Id*. at p. 217.)  After reviewing federal case law interpreting title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e et seq.), the court similarly concluded there was not "one 'true' meaning of the phrase [in that enactment], but rather different understandings of congressional intent at different times."  (*Harris,* at pp. 218-221.)  The court ultimately concluded, based on the FEHA's "preventive and deterrent purposes" (*Harris,* at p. 225), that in "a mixed-motives case," where "there is no single 'true' reason for the employer's action," but rather "a mix of discriminatory and legitimate reasons motivated the employer's decision" (*id*. at p. 215), "a same-decision showing by an employer is not a complete defense to liability *when the plaintiff has proven that discrimination on the basis of a protected characteristic was a substantial factor motivating the adverse employment*

20

*action.*" (*Id*. at p. 225, italics added.) However, such a showing does limit the plaintiff's available remedies. (*Id*. at pp. 232-235.)

The Department argues the requirement that a plaintiff establish discrimination was a substantial factor motivating the adverse employment action "is not limited to mixed motive cases," but rather applies to all employment discrimination cases, citing a regulation promulgated by the Department of Fair Employment and Housing (DFEH) in 2015 (Cal. Code Regs., tit. 2, § 11009, subd. (a)) and two standard civil jury instructions (CACI Nos. 2500 & 2507), incorporating the substantial motivating factor language without limiting application of that standard to mixed-motive cases involving a same-decision defense. We agree.[5] As we stated in *Arnold v. Dignity Health* (2020) 53 Cal.App.5th 412, during our statement of the legal framework applicable to workplace discrimination claims: "The discrimination at issue must be a substantial motivating factor in the adverse employment decision." (*Id*. at p. 425.) But this does not mean the plaintiff must establish causation by this standard *before* the employer is required to supply evidence of a legitimate, nondiscriminatory reason for the adverse employment decision.

The facts in *Harris* demonstrate the first two stages of the *McDonnell Douglas* test were satisfied. Based on the timing of the firing, two days after Harris submitted a doctor's note related to her pregnancy, after her supervisor appeared disappointed that she was pregnant, it is clear to this court that Harris established a prima facie case of discrimination. However, the city produced substantial evidence that it possessed a legitimate, nondiscriminatory reason for the firing, i.e., Harris was a probationary

---

[5] This conclusion makes it unnecessary to address the Department's additional argument that "[t]he trial court erred in ruling that [the Department] waived its arguments regarding the DFEH regulations and CACI jury instructions by not reiterating them in its reply brief" at trial.

employee who had two preventable accidents and two failures to report for her shift. Indeed, the fact that the case went to trial before a jury indicates that stage three of the analysis was underway. (See *Caldwell v. Paramount Unified School Dist.* (1995) 41 Cal.App.4th 189, 202 ["in the usual case, the first two prongs of the three-part *McDonnell Douglas* test, that is, whether the plaintiff has stated a prima facie case of discrimination and whether the employer has rebutted that prima facie showing, will be tested prior to trial"]; *id*. at p. 204 ["if and when the case is submitted to the jury, the construct of the shifting burdens 'drops from the case,' and the jury is left to decide which evidence it finds more convincing, that of the employer's discriminatory intent, or that of the employer's race- or age-neutral reasons for the employment decision"].)

Here, unlike *Harris*, the Board concluded the Department did not carry its stage-two burden of producing sufficient evidence of a legitimate, nondiscriminatory reason for the challenged conduct. Accordingly, Dr. Mabry-Height prevailed based on the " 'legally mandatory' " presumption of discrimination and was not required to proceed to the third stage of the analysis. (*Guz*, *supra*, 24 Cal.4th at p. 355, quoting *Texas Dept. of Community Affairs v. Burdine* (1981) 450 U.S. 248, 254, fn. 7.) This was proper as long as the Board did not abuse its discretion in concluding the Department failed to carry its stage-two burden of production.[6] We turn to this question now.

---

[6] The Department also argues the Board misallocated the burden of persuasion by requiring the Department to establish that it acted for legitimate, nondiscriminatory reasons rather than requiring Dr. Mabry-Height to prove the challenged employment decisions were substantially motivated by her race, age, or gender. Not so. For the reasons explained immediately above, the Board did not require the Department to persuade it of anything. All the Department was required to do was produce sufficient evidence of legitimate, nondiscriminatory reasons, from which a trier of fact could conclude those reasons actually motivated the challenged conduct. If it carried that burden *of production, not persuasion*, stage three of the analysis would have required Dr. Mabry-Height to carry her ultimate burden of persuasion. Nor are we persuaded by

## B.

### *Sufficiency of the Evidence Rebutting the Presumption of Discrimination*

The Department asserts that the Board abused its discretion in concluding the Department did not satisfy its stage-two burden of producing substantial evidence of legitimate, nondiscriminatory reasons for the challenged conduct. We conclude there was no abuse of discretion.

### 1.

### *Failure to Interview/Hire Between July and September 2008*

As stated previously, the Board adopted ALJ Deimerly's conclusions regarding stage two of the analysis. With respect to the Department's failure to interview Dr. Mabry-Height for open positions between July and September 2008, the ALJ concluded the Department produced no evidence of a nondiscriminatory reason for this failure. As set forth more fully earlier in this opinion, the ALJ explained that "Dr. Ritter . . . testified that he had no knowledge as to why [Dr. Mabry-Height] was not interviewed" for the positions filled by Drs. Veltmeyer and James. And "[n]either Dr. Barreras nor Dr. Ritter offered any explanation" as to why she was not interviewed for the position filled by Dr. Ko.

The Department argues it produced sufficient evidence of nondiscriminatory reasons for not interviewing Dr. Mabry-Height for these positions. First, based on the timing of the positions being filled, the Department argues Dr. Mabry-Height was not hired for the first CVSP position because "[Dr.] Veltmeyer was hired first." We acknowledge, as the Department points out, that Dr. Veltmeyer was hired "just four days

---

the fact that the "**CONCLUSIONS OF LAW**" portion of the decision states that the Department "failed to prove that it had legitimate, nondiscriminatory reasons" for failing to interview/hire Dr. Mabry-Height for open positions between July and September 2008 or for revoking her registry credential in October 2008. Reading the decision in its entirety, it is clear that the ALJ/Board understood this was a burden of production that the Department failed to carry, not a burden of persuasion.

after [Dr. Mabry-Height] informed Dr. Ritter that she was interested in a CVSP posit[i]on." (Italics omitted.) The Department also touts Dr. Veltmeyer's qualifications for the position, notwithstanding his relative lack of experience. We do not dispute that the Department could have had legitimate, nondiscriminatory reasons for hiring Dr. Veltmeyer when it did, rather than holding the position open to allow Dr. Mabry-Height to interview. It is entirely possible that Dr. Veltmeyer showed tremendous promise as a medical student, and that he made such an impression during his March 2008 interview that the Department wanted to hire him the second he became eligible for the position. But no one with hiring authority at the Department testified that this was actually what happened. The only evidence on the matter, aside from the timeline of events highlighted by the Department, is Dr. Ritter's testimony that he did not know why Dr. Mabry-Height was not interviewed. That is not sufficient.

With respect to the position filled by Dr. James, she was not interviewed for that position until July 29, 2008, more than two weeks after Dr. Mabry-Height expressed interest in a position at CVSP. Again, Dr. Ritter had no idea why Dr. Mabry-Height was not interviewed for the position. On appeal, the Department points out that Dr. James applied for the position two months before Dr. Mabry-Height expressed interest to Dr. Ritter and argues "as with Dr. Veltmeyer, the timing . . . was an important and non-discriminatory factor in the decision." But again, no one with hiring authority at the Department testified that Dr. Mabry-Height's expression of interest was too late for her to be interviewed, and that this was the actual reason she was not interviewed or hired for the position. The Department also argues "that it perceived Dr. James to be a better candidate than [Dr. Mabry-Height]," contrasting their respective résumés. Once again, this is a possible nondiscriminatory reason for not interviewing Dr. Mabry-Height, albeit unlikely given their comparable qualifications and experience, but possible. Had someone with hiring authority testified that this was the actual reason, we might well conclude the Department carried its stage-two burden of production. But no one did.

24

Instead, Dr. Ritter testified he had no idea why she was not interviewed for the CVSP position. This is not enough.

The same shortcomings plague the Department's attempt to justify the failure to interview Dr. Mabry-Height for the CSP position filled by Dr. Ko, except here, both Dr. Ritter and Dr. Barreras were unaware of any legitimate reasons for the failure to interview her for that position.

We conclude that where a plaintiff establishes a prima facie case of discrimination based on a failure to interview her for open positions, the employer must do more than produce evidence that the hiring authorities did not know why she was not interviewed. Nor is it enough for the employer, in a writ petition or on appeal, to cobble together after-the-fact *possible* nondiscriminatory reasons. While the stage-two burden of production is not onerous, the employer must clearly state the *actual* nondiscriminatory reason for the challenged conduct.

## 2.

### *Revocation of Dr. Mabry-Height's Credentialing*

Turning to the Department's revocation of Dr. Mabry-Height's credentialing in October 2008, the ALJ noted that Dr. Ritter testified that the credentialing process is a standard, objective verification process. When Dr. Mabry-Height's credentials were initially approved, the credentialing unit simply verified that her medical license and board certification were valid. Dr. Mabry-Height provided unchallenged testimony that nothing changed in that regard between June and October 2008. And while the Department offered Dr. Mabry-Height multiple nondiscriminatory reasons for revoking her credentialing, e.g., she received a negative review from CSP and did not meet the Department's needs, the ALJ found these purported reasons to be "vague, ambiguous, and inconsistent with the stated objective purpose of credentialing."

The Department reasserts these reasons on appeal and argues the Board abused its discretion in concluding they did not suffice to rebut the presumption of discrimination.

We disagree.  As the ALJ outlined in the decision, the reasons provided to Dr. Mabry-Height were contradicted by the testimony offered at the hearing and no one from the credentialing unit testified that these were the actual reasons her credentialing was revoked.  On this record, we cannot conclude there was an abuse of discretion.

DISPOSITION

The judgment is affirmed.  Respondent, Vickie Mabry-Height, M.D., is entitled to costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(1), (2).)

                                        /s/_____
                                        HOCH, J.

We concur:

 /s/_____
RAYE, P. J.

 /s/_____
BLEASE, J.